The indictment upon which the prisoner was tried, is as follows:
 "STATE OF NORTH CAROLINA, } SUPERIOR COURT OF LAW, Caswell County, } Fall Term, 1857.
The jurors for the State, upon their oath present, that John, a negro slave, the property of Samuel Watkins, in the county of Caswell aforesaid, on the nineteenth day of June, in the year of our Lord one thousand eight hundred and fifty seven, with force and arms in the county aforesaid, in the common and public highway of the State, in and upon one Matthew Brooks, then and there being in the peace of God, feloniously did make an assault, and him, the said Matthew Brooks, in bodily fear and danger of his life in the highway aforesaid, then and there did feloniously put, and one pocket-book, containing divers, to wit, ten, bank-notes, for the payment of divers sums of money, in the whole amounting to a large sum of money, to wit, the sum of two hundred and twenty-eight dollars, of the value of two hundred and twenty-eight dollars, of the goods and chattels of the said Matthew Brooks, in the highway aforesaid, then and there feloniously and violently did steal, take and carry away, contrary to the form of the statute, in such case made and provided, and against the peace and dignity of the State."
There were two other counts in the bill, of the same tenor and effect, except that the second charged the stealing of the bank-notes alone, and the third the pocket-book alone.
The evidence upon the only point considered by this Court was, that on the 19th of June last, the prosecutor, Brooks, was in Milton in the county of Caswell, with a wagon and two horses and a portion of his crop of tobacco; that having sold the tobacco and made some purchases, he drove out of the *Page 165 
town intending to camp at a cross-road about three miles distant; that at a short distance outside of the limits of the town, at a bridge across a small stream, he stopped to water his horses, and while so engaged, it being then about dark, a negro came over the bridge from the town, and enquired which of the two roads near by he intended to travel; the witness told him, and, thereupon, the negro passed on along the road indicated; that at the same time, another person came over the bridge and took the other road; that the witness soon overtook the negro, and they travelled on together in occasional conversation, the negro walking and the witness sitting in and driving his wagon, until the negro told the witness that he had found a bill of money in the streets of Milton, and he wanted him to look at it, and tell him how much it was; that the witness objected on account of its being dark, but the negro insisted, and, after some further conversation, not material, a torch light was struck from matches with pine wood, and the bill examined; that the amount of the bill excited his suspicions, and he took particular notice of the negro's face, his clothes,c.; that while the witness was examining the bill, the negro's hand was felt in his pocket upon his pocket-book; that the witness immediately seized his arm, the negro at the same time snatching the bill of money; that a scuffle ensued, in which the witness was thrown out of the wagon under the tongue, and when he arose the negro was running off, having taken the pocket-book from his pocket, and also the bill of money they were examining; that the pocket-book contained four fifty-dollar bills, a ten, several fives and a two, making in all two hundred and twenty-seven dollars; that the struggle occurred at a point in the public road about a mile from Milton, at about nine o'clock; that the negro in question, was a large and powerful-looking man. He also testified that the prisoner was the negro of whom he had spoken.
The case below turned chiefly upon the identity of the prisoner with the assailant described by the witness; and many exceptions were taken by the prisoner to the ruling upon questions as to the evidence offered by the State, and to *Page 166 
the charge of his Honor, but as the consideration of this Court is entirely confined to the sufficiency of the facts to constitute the crime charged, it is not deemed essential to state more of the record sent to this Court.
The prisoner was convicted, and, sentence of death having been pronounced by the Court, he appealed.
He cited and commented on the opposing authorities of Gnosil's case, 1 Car. and P. 304, 11; E. C. L. Rep. 400, and Francis' case, 2 Stra. 1015.)
Robbery is committed by force; larceny by stealth. The original cause for making highway robbery a capital felony, without benefit of clergy, was, an evil practice, in former days very common, of meeting travellers, and, by a display of weapons, or other force, putting them in fear, ("stand and deliver,") and in this way taking their goods by force. Hence the indictment (the form is still retained,) contains this allegation: "and him (the person robbed,) in bodily fear and danger of his life, in the highway, then and there, did feloniously put," and it was for a long time held that the allegation must be proved.
In Foster's Criminal Law, page 128, is this passage: "The prisoner's counsel say there can be no robbery without the circumstance of putting in fear. I think the want of that *Page 167 
circumstance alone ought not to be regarded. I am not clear that that circumstance is, of necessity, to be laid in the indictment so as the fact be charged to be done nolenter et contra voluntatem. I know there are opinions in the books which seem to make the circumstance of fear necessary, but I have seen a good MS. note of an opinion of Lord HOLT to the contrary, and I am very clear that the circumstance of actual fear at the time of the robbery, need not be strictly proved. Suppose the true man is knocked down without any previous warning to awaken his fears, and lieth totally insensible while the thief rifleth his pockets, is not this robbery? And yet where is the circumstance of actual fear? Or suppose the true man maketh a manful resistance, but is overpowered, and his property taken from him by the mere dint of superior strength, this, doubtless, is robbery. In cases where the true man delivereth his purse without resistance, if the fact be attended with those circumstances of violence and terror which, in common experience, are likely to induce a man to part with his property for the sake of his person, that will amount to a robbery. If fear be a necessary ingredient, the law in odium spoliatoris
will presume fear, where there appeareth to be so just a ground for it."
In Foster's day it would not have occurred to any lawyer, that the facts set out in the record, now under consideration, made a case of highway robbery. There was no violence — no circumstance of terror resorted to for the purpose of inducing the prosecutor to part with his property for the sake of his person.
Violence may be used for four purposes: 1st. To prevent resistance. 2nd. To overpower the party. 3rd. To obtain possession of the property. 4th. To effect an escape. Either of the first two, makes the offence robbery. The last, I presume it will be conceded, does not. The third is a middle ground. In general it does not make the offence robbery, but sometimes, according to some of the cases, it does. It is necessary, therefore, to see how the authorities stand in respect to it. *Page 168 
After Foster's day, the idea of robbery was extended so as to take in a case of snatching a thing out of a person's hand and making off with it, without further violence; but in Plunket's case, tried before BULLER, J., and THOMPSON, B., it was held, that snatching an umbrella out of a lady's hand as she was walking the street, was not robbery; and the court say, "It had been ruled about eighty years ago, by very high authority, that the snatching any thing from a person, unawares, constituted robbery; but the law was now settled, that unless there was some struggle to keep it, and it were forced from the hand of the owner, it was not so. This species of larceny seemed to form a middle case between stealing privately from the person, and taking by force and violence;" 2 East's P. C. 703. In Lapier's
case, an ear-ring was so suddenly pulled from a lady's ear that she had no time for resisting, yet being done with such violence as to injure herperson, the blood being drawn from her ear, which was otherwise much hurt, it was held to be robbery; 2 East's P. C. 708. So in Moore's case, 1 Leach, 335: A diamond pin, which a lady had strongly fastened in her hair with acorkscrew twist, was snatched with so much force as to tear out a lock of hair, it was held robbery, because of the injury to the person. Possibly the ground on which these two cases is put may be questioned, as the injury to the person was accidental, and seems not to have been contemplated, but they have no bearing on our case.
In Davies' case, the prisoner took hold of a gentleman's sword, who, perceiving it, laid hold of it at the same time, and struggled for it. This was adjudged to be robbery; 2 East's P. C. 709.
In Mason's case, 2 Russ. and Ry. 419, (in 1820) the prisoner took a watch out of a gentleman's pocket, but it was fastened to a steel chain
which was around his neck; the prisoner made two or three jerks until he succeeded in breaking the chain; PARK B. instructed the jury that this was robbery; but doubts being expressed, he referred it to all the Judges, who were unanimous in the opinion that it was robbery, *Page 169 
because of the force used to break the chain, which was around the gentleman's neck. This is all the Report says. It is short, and to me unsatisfactory, seeming to go back to the idea of robbery that existed before Plunket's case.
In Gnosil's case, 1 Car. and Payne, 304, (11 E. C. L. Rep. 400, 1824,) the prosecutor was going along the street, the prisoner laid hold of his watch-chain, and with considerable force jerked it from his pocket, ascuffle then ensued, and the prisoner was secured; GARROW B., "The mere act of taking, being forcible, will not make this offense a highway robbery. To constitute the crime of highway robbery, the force used must be either before, or at the time of, the taking, and must be of such a nature as to show that it was intended to overpower the party robbed or prevent hisresisting, and not merely to get possession of the property stolen. Thus, if a man, walking after a woman in the street were, by violence, to pull her shawl from her shoulders, though he might use considerable force, it would not, in my opinion, be highway robbery; because the violence was not for the purpose of overpowering the party robbed, but only to get possession of the property." This decision was four years after Mason'scase, and I suppose GARROW was then one of the Judges. According to this case, which is the latest that we have met with, our case is not robbery, even if it be admitted to fall under the third head of violence above enumerated. Our case is clearly distinguishable from Davies' case, for both parties had hold of the sword and struggled for it. If Davies had let it go, there would have been no necessity for violence, and his holding on, and struggling for it, could only be imputed to his determination to take it by force. In our case, the prosecutor did not have hold of the pocket-book; there was no struggle for it; but he had hold of theprisoner's arm. So he could not, by letting go the pocket-book, have avoided the necessity for violence, and the struggle in which the prosecutor fell under the tongue of the wagon, is fairly imputable to an effort on the part of the prisoner to get loose from his grasp and make his escape. The only difference between this case and that of Gnosil, is, that *Page 170 
the one succeeded in getting loose and the other was less fortunate. Suppose, in the struggle, the prosecutor had been too strong for the prisoner, and had succeeded in arresting him, there was a taking of the pocket-book and an asportavit, so as to constitute larceny in "picking of the pocket," but would any one have said it amounted to robbery? Can the nature of the offense be changed by the accident, that the prisoner succeeded in getting away, because the prosecutor happened to fall on the tongue and double tree, which broke his hold from the arm of the prisoner?
Our case is also clearly distinguishable from Mason's case. The watch was fastened to a steel chain, which was around the neck of the prosecutor. Had Mason let the watch go, there would have been no necessity for violence; his holding on and jerking until he broke the chain, could only be imputed to a determination to take the watch by force.
Trexler's case, 2 Car. Law Repos. 90, was also cited in the argument. That was an indictment for forcible trespass. The defendant had taken a bank-note out of the pocket-book of the prosecutor, who tried to get it away from him. He resisted and a struggle ensued. SEAWELL, J., arguendo, expresses the opinion that the evidence showed force enough to constitute robbery, although the prosecutor did not have hold of the bank-note. This, I suppose, was said to meet what BULLER says in Plunkett's case, "unless there was some struggle to keep it, and it were forced from the hand of theowner." However that may be, it is sufficient to say that was a meredictum. It is true, Judge SEAWELL was greatly distinguished as a criminal lawyer, but a dictum in reference to a capital offence, cannot be much relied on when thrown out in considering a misdemeanor.
After much consideration, I am convinced that the facts set out in this record, do not constitute highway robbery. I am, therefore, of opinion that the judgment ought to be reversed, and a venire de novo awarded.